UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

OSMAN ALVAREZ,

                              Plaintiff,

      -against-

THE UNITED STATES OF AMERICA,

                              Defendant.

------------------------------------------------------------------X

**FILED**
**CLERK**
3:40 pm, Apr 04, 2024
**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**MEMORANDUM OF**
**DECISION AND ORDER**

CV 21-4766 (GRB)(ARL)

**GARY R. BROWN, United States District Judge:**

      This action, involving a low speed, low impact car collision, was brought under the Federal Torts Claims Act and, consistent with the dictates of the statutory scheme, tried before this Court without a jury. As plaintiff has failed to establish that he suffered a compensable injury under applicable New York No-Fault Insurance provisions, judgment must be entered in favor of the United States. Moreover, the evidence, which this Court has considered with great care, revealed potentially dubious practices by Dr. Ricky Madhok, a practicing neurosurgeon, that this Court must, in all good conscious, bring to the attention of the relevant state licensing authorities for further investigation.

      **Procedural History**

      On August 24, 2021, after properly exhausting his administrative remedies, plaintiff commenced this action via the filing of a complaint. Docket Entry ("DE") 1, 5. The Government answered, raising several affirmative defenses, including the assertion that the accident "was not the cause in fact or proximate cause of any injury or damage," and that plaintiff had not sustained sufficient economic loss and/or serious injury under the New York

1

Insurance Law § 5101, *et seq.* *See* DE 9. Counsel exchanged substantial fact and expert discovery, conducted depositions and physical examinations and prepared the case for trial. Trial commenced on November 28, 2023. DE 22. Plaintiff presented his case over three days; defendant later rested without presenting a case. DE 22-25, 31-33. Counsel both submitted Proposed Findings of Fact and Conclusions of Law, supporting briefs and responses thereto. DE 29, 30, 34.

This opinion follows.

**Facts**

The following facts are drawn from the testimony at trial and the exhibits admitted. Plaintiff Osman Alvarez, then 40 years old, was involved in a motor vehicle accident on November 4, 2019, in the early evening hours. At the time of the accident, Alvarez was stopped in an intersection, wearing his seat belt. A U.S. postal truck pulled up behind him but failed to stop in time, leading to a rear-end collision of sufficiently modest impact that the airbags did not deploy. The vehicle sustained several thousand dollars in damage. Alvarez, a Honduran citizen who does not speak English, did not open his window to speak to the postal driver, waving him away.

Plaintiff's sworn accounts of the accident and its purported consequences suffered from troubling inconsistencies. The clearest of these concerns the force of the impact. On direct examination, using reference points in the courtroom, Alvarez testified that the impact "pushed me forward" a distance that the Court observed, and the parties agreed, amounted to about ten feet. Tr.[1] 33-34. He alternatively described this distance as essentially the width of an

---

[1] "Tr." is used to indicate the citation to the transcript of the trial held between November 28-30, 2023, and can be found at DE 31-33.

intersection. Tr. 34 ("I was going to make a left turn and after the impact, I was pushed forward almost before the next block."). On cross-examination, plaintiff was confronted with his deposition testimony, during which he indicated that his vehicle had been pushed only one foot, which plaintiff claimed not to remember. Tr. 78-79. He also could not recall during cross-examination the testimony he gave on direct examination. Tr. 78. Such inconsistencies[2] raise fundamental doubts about plaintiff's credibility about the events in question.

Plaintiff sustained no head trauma from the accident and remained ambulatory, but was brought to South Side Hospital where, complaining only of neck pain, plaintiff was prescribed a muscle relaxant and Tylenol. Tr. 41-42. Following this, based on referrals from his lawyer, plaintiff visited several no-fault medical providers. Tr. 43. The first was a chiropractor named Dr. Christopher Whyte, seen one week after the accident. Tr. 43. By this time, plaintiff's complaints also encompassed bilateral shoulder and knee pain. Tr. 46-47. These complaints, made through a translator, included sensitivities variously described as "sharp, aching, spastic, throbbing, and cramping." Tr. 48. Dr. Whyte's records, presumably based on his discussion with plaintiff, state that "immediately following the accident, the patient's main complaints included . . . pain in the low back," an assertion not supported by the contemporaneous records. Ex. A at 43. Similarly, during another visit with Dr. Saweh Harhash, a pain and sports medicine doctor, seen in June 2021, plaintiff "reported he did sustain direct head trauma" from the accident, a claim also belied by the contemporaneous medical records. Ex. C at 6. These

---

[2] The record is replete with contradictions and failure of recall by plaintiff—of varying degrees of relevance—which reinforce doubts about plaintiff's credibility. *See, e.g.*, Tr. 86-87 (inconsistent reporting about resumption of work as a singer and reasons therefore); Tr. 95 (whether plaintiff saw the truck before the accident); 98 (plaintiff claiming injury to hands); Tr. 99-100 (inconsistencies regarding prior work doing heavy construction); Tr. 115 (plaintiff's failure to work as a DJ attributable to COVID pandemic, rather than disability).

findings raise questions about the reliability of plaintiff's subjective complaints of pain and disability, upon which his case largely rests. For reasons virtually unsupported by this record, plaintiff underwent a spinal fusion in his cervical spine at C4-5.

Ultimately, though, the case turns on whether plaintiff provided sufficient proof that these alleged injuries—to the extent they exist—were caused by the accident. Other than plaintiff's inconsistent and problematic testimony, the only evidence of causation offered was the expert testimony of Dr. Ricky Madhok, a neurosurgeon, then operating under the auspices of Neuro-Axis Neurological Associates, P.C., an entity with which he had some affiliation.[3]

Dr. Madhok had an initial consultation with plaintiff on March 13, 2020, four months after the accident occurred. Tr. 53, 212, 216; Ex. G at 2-5. According to Madhok's records, plaintiff's chief complaints were "lumbar pain and rught [sic] shoulder" with a secondary complaint of neck pain. Exhibit G at 2; Tr. 217. Amazingly, without testing for instability of plaintiff's neck or performing any range of motion tests on plaintiff's neck, back, shoulder or any other body part, Tr. 221–22, Madhok diagnosed plaintiff with neck pain with associated cervical spondylolisthesis and recommended surgical stabilization of the C4-5 region to prevent shifting. Tr. 229–30. He advised that spinal fusion surgery on plaintiff at C4-5 was urgently needed "to prevent further progression" of the listhesis and to "stabiliz[e]" because of the "risk[] that subsequent listhesis or progression of that listhesis" could "result[] in potentially permanent and devastating neurologic injury." Tr. 152–53. He explained that the condition, if left untreated,

---

[3] The exact relationship between Dr. Madhok and Neuro-Axis was the subject of equivocal testimony. *See* Tr. 129 (Madhok "previously associated with" and "affiliated" with Neuro-Axis); Tr. 130 ("went to private practice with Neuroaxis"); Tr. 213 ("I was a partner in the practice"); Tr. 226 ("We were acquired by NYU"). Interestingly, a recent pending complaint alleges that Madhok was an employee without any ownership interest in Neuro-Axis, but falsely claimed an ownership interest. *See Johnson v. Madhok, et ano.*, Nassau County Supreme Court, Index. No. 616653/2023. Of course, these represent unsubstantiated allegations.

4

could lead to paralysis or death.  Tr. 260, 329.  The risk of paralysis and death could arise from further aggravation of the purported listhesis, which could arise from a second accident or trauma.  Tr. 193.

Plaintiff's position regarding causation was that "Dr. Madhok's opinion, to a reasonable degree of medical certainty, was that plaintiff [] suffered a permanent injury to the cervical spine as a result of the motor vehicle accident."  DE 29 ¶ 62 (citing Tr. 209).[4]  As discussed further below, Dr. Madhok's testimony proved unreliable in several respects.[5]  Even assuming, however, that the Court could rely upon Dr. Madhok's opinion, the bases for this assertion prove insufficient.

Dr. Madhok offered the following as the sole basis for his opinion:

> Patient did not have symptoms prior to the accident.  Symptoms began after the accident.  Imaging was concorded with an injury to the spine and clinical symptoms were concorded.  He underwent surgery and his symptoms improved afterwards.

Tr. 209.  Notwithstanding this conclusory testimony, cross-examination revealed the limitations of Dr. Madhok's causation testimony.  Dr. Madhok had no training or expertise in accident reconstruction and acknowledged being incapable of calculating the accident's impact upon

---

[4] Another formulation of Dr. Madhok's causation position suggested that "[plaintiff's] cervical injury and lumbar injury were as a result of the accident he sustained."  Tr. 213.  Understandably, plaintiff appears to have abandoned his position regarding injury to the lumbar portions of his spine, as Dr. Madhok conceded that his review of MRI films taken of plaintiff identified "only potentially degenerative or age-related conditions in plaintiff's lumbar spine."  Tr. 251.

[5] Dr. Madhok's credibility came into question in several areas, including that of his compensation.  The doctor was paid $13,000 for a few hours of testimony because it required him "to clear [his] schedule for the full day," and had charged (and been paid) an additional $13,000 because of a change in the trial schedule.  Tr. 133–34.  Madhok testified that this represented "in terms of the typical day, the amount of surgery of the patients we would see in a day."  Tr. 134.  However, when asked by the Court if he, in fact, generated $65,000 in the typical five-day week, Madhok responded that he "can't answer that," but directed the Court to "general literature" suggesting that "a neurosurgeon typically generates . . . anywhere from 5 to 20 million as a providing physician."  Tr. 135–36.

5

plaintiff's body. Tr. 214–15. He was unaware of the speed at which the vehicles were travelling, whether the airbags deployed, whether plaintiff's body came into contact with any part of the car, how plaintiff was positioned or whether plaintiff sustained bruising or swelling from the accident. Tr. 214–16. Though he conceded that it was "important to know . . . how [the injury] occurred to [plaintiff's] neck," Tr. 322, Dr. Madhok did not take the time to even ask plaintiff how he injured himself in the accident. Tr. 217.

The truth is that Dr. Madhok relied almost exclusively upon plaintiff's subjective reports and descriptions of pain[6] to form the opinion that he was injured in the accident. The only exception (and the sole objective finding supporting spinal fusion surgery) was a single set of x-ray films purportedly showing listhesis, which Dr. Madhok claimed to have taken on March 13, 2020, but failed to produce in discovery and, he testified, is no longer in his possession and the whereabouts of which are unknown. Tr. 166, 325–26. Dr. Madhok's records are devoid of the measurement of the degree or grade of this purported finding and, more importantly, there is no objective evidence linking the listhesis, even assuming it existed, to the accident. *Cf.* Tr. 362–66 (Dr. Richter explaining grades of listhesis). Moreover, competent evidence of record ties plaintiff's subjective complaints to pre-existing injuries or conditions. *See, e.g.*, Tr. 272, 315

---

[6] On cross-examination, Dr. Madhok testified that plaintiff's *subjective* complaints of pain became an *objective* measure because the doctor had asked plaintiff to rate the pain on a ten-point scale and "he rated it 9 out of 10." Tr. 235. To support this rather extraordinary assertion, Dr. Madhok explained that "the American Medical Association now associates pain as the fifth vital sign." Tr. 235. Unfortunately, notwithstanding Madhok's testimony, (1) the AMA's recommendation that pain be deemed a vital sign does not transmute a subjective report into an objective measure, *see* Tr. 408 (plaintiff's second medical expert testifying that pain is subjective), and (2) the AMA no longer maintains this position and has not for some time. *See* Clara Scher, BA et al., *Moving Beyond Pain as the Fifth Vital Sign and Patient Satisfaction Scores to Improve Pain Care in the 21st Century*, NATIONAL LIBRARY OF MEDICINE, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5878703 (last visited Apr. 4, 2024) [https://perma.cc/5XNS-AFMA] ("[D]elegates at the 2016 American Medical Association (AMA) meeting voted to stop treating pain as the fifth vital sign . . . .").

6

(discussing the presence of osteophytes associated with degenerative changes that take years to develop); 253–54 (independent findings made ten days after the accident of "acute on chronic" pain, suggesting plaintiff's pain existed well before the accident); 248–49 (MRI finding of disc desiccation defined as "dryness that comes from aging"); 287 (testimony concerning facet hypertrophy as a pre-existing spinal condition).

In response to questioning by the Court, however, as to the magnitude of the risk of paralysis or death from subsequent injury, Madhok twice observed that it was a "very good question," then acknowledged that there is no "medical literature to document that risk." Tr. 186. In other words, he simply did not have an answer and "cannot give an exact number." Tr. 186, 189. Eventually, Madhok testified that risk would be "significantly elevated as opposed to someone without these findings." Tr. 193.[7] Yet, this unquantifiable risk represented the principal, if not exclusive, justification for the surgery. Tr. 187 (testifying that pain relief would be a secondary benefit, but without the unquantifiable risk of paralysis, conservative treatment would be warranted); *cf.* Tr. 372, 375 (Dr. Richter testifying about pain following spinal fusion: "[y]ou hope for it to be better but you don't count on that").

Records kept by Madhok and associated providers are laden with deficits and errors. In one note, plaintiff is described as having suffered from a "neck fracture," which is plainly incorrect. Ex. L at 7; Tr. 170–71. Another notation refers to the ENT providing service for "exposure rheumatology" which Madhok describes as a "typo." Tr. 171. Notwithstanding the significant deficiencies in his records, Madhok carefully documented his repeated cautions to plaintiff concerning the other potential risks from the surgery, which included "neurologic and

---

[7] Importantly, the findings he referred to included observations purportedly made during the cervical fusion procedure. Tr. 193. However, these *post-hoc* rationalizations for the surgery were not objectively demonstrated.

healing risks, risks of bleeding stroke, heart attack, death, pneumonia, infection" and deep vein thrombosis, the risk of which he set at "up to five percent." Tr. 188–89.  Additionally, he cautioned plaintiff of a ten to fifteen percent risk of "adjacent level disease," meaning the spinal fusion could fail and/or negatively impact the adjacent vertebral spaces.  Tr. 190.

Finally, Madhok testified that plaintiff has now suffered a "permanent partial disability" because he medically fused plaintiff's joint.  Tr. 198 ("[W]e call that a level of permanency due to the fusion of the joint").  Dr. Richter, a second expert called by plaintiff, lacked sufficient information to opine as to whether the spinal fusion was necessary or appropriate.  Tr. 363–64. As the trier of fact, this Court harbors substantial doubts as to the credibility of plaintiff and Dr. Madhok, and, for the reasons that follow, finds their testimony insufficiently reliable to satisfy plaintiff's burden of causation.

**Discussion**

The parties agree that this case is not only governed by the limited waiver of sovereign immunity contained in the Federal Tort Claims Act but must also satisfy the provisions of New York's No-Fault Law.  In *Pommells v. Perez*, 4 N.Y.3d 566, 570–72 (2005), the New York Court of Appeals reiterated the purposes underlying the No-Fault provisions, highlighting the difficulties applying its requisites to cases like the one at bar:

> In 1973, the Legislature enacted the "Comprehensive Automobile Insurance Reparations Act" (*see* L 1973, ch. 13)--commonly known as the No-Fault Law-- with the objective of promoting [] prompt resolution of injury claims, limiting cost to consumers and alleviating unnecessary burdens on the courts (*see* Governor's Mem approving L 1973, ch. 13, 1973 McKinney's Session Laws of NY, at 2335). Every car owner must carry automobile insurance, which will compensate injured parties for "basic economic loss" occasioned by the use or operation of that vehicle in New York State, irrespective of fault (Insurance Law § 5102 [a]; § 5103). Only in the event of "serious injury" as defined in the statute, can a person initiate suit against the car owner or driver for damages caused by the accident (Insurance Law § 5104 [a]).

8

> No-Fault thus provides a compromise: prompt payment for basic economic loss to injured persons regardless of fault, in exchange for a limitation on litigation to cases involving serious injury (*see Montgomery v Daniels*, 38 NY2d 41, 50-51 [1975]). Abuse nonetheless abounds. From 1992 to 2000, reports of No-Fault fraud rose more than 1,700% and constituted 75% of all automobile fraud reports received by the Insurance Department in 2000 (*see Matter of Medical Socy. of State of N.Y. v Serio*, 100 NY2d 854 [2003]; *see also State Farm Mut. Auto. Ins. Co. v Mallela*, 4 NY3d 313 [2005]). There is, similarly, abuse of the No-Fault Law in failing to separate "serious injury" cases, which may proceed in court, from the mountains of other auto accident claims, which may not. That "basic economic loss" has remained capped at $50,000 since 1973 provides incentive to litigate.
>
> In the context of soft-tissue injuries involving complaints of pain that may be difficult to observe or quantify, deciding what is a "serious injury" can be particularly vexing. Additionally, whether there has been a "*significant*" limitation of use of a body function or system (the threshold statutory subcategory into which soft-tissue injury claims commonly fall) can itself be a complex, fact-laden determination. Many courts have approached injuries of this sort with a well-deserved skepticism. Indeed, failure to grant summary judgment even where the evidence justifies dismissal, burdens court dockets and impedes the resolution of legitimate claims. As a hint of the dimension of the situation, in less than three years, *Toure v Avis Rent A Car Sys*. (98 NY2d 345 [2002])--addressing similar issues--already has been cited more than 500 times in published decisions of our trial and appellate courts (representing only a small portion of the trial court activity).

As a partial response to these difficulties, courts have carefully examined cases to ensure that a plaintiff's injuries constitute serious injury as defined by the statute and have also scrutinized the proof of causation offered by plaintiffs. Thus, as one state appellate court noted:

> To recover damages for noneconomic loss related to personal injury allegedly sustained in a motor vehicle accident, the plaintiff is required to present nonconclusory expert evidence sufficient to support a finding not only that the alleged injury is "serious" within the meaning of Insurance Law § 5102 (d), but also that the injury was causally related to the accident.

*Diaz v. Anasco*, 38 A.D.3d 295, 295–96 (1st Dept. 2007). Other cases have reached similar holdings. *See, e.g.*, *Chung v. State*, 70 Misc. 3d 775, 786 (N.Y. Ct. Cl. 2020) ("Claimants must submit objective expert evidence showing that their injuries satisfy the serious injury threshold; medical opinions based upon a claimant's subjective complaints alone are not enough.").

9

In *Pommells*, the New York Court of Appeals held that where, as here, "additional contributory factors interrupt the chain of causation between the accident and claimed injury—such as a . . . preexisting condition—*summary dismissal* of the complaint may be appropriate." 4 N.Y.3d at 572 (emphasis added).  Indeed, the New York Court of Appeals found on summary judgment that a defendant "properly relied on medical records and reports prepared by plaintiff's treating physicians to establish that plaintiff did not suffer a serious injury causally related to the accident" and shifted the burden to plaintiff to come forward with proof on these issues. *Franchini v. Palmieri*, 1 N.Y.3d 536, 537 (2003).  Notably, plaintiff's "experts failed to adequately address plaintiff's preexisting back condition and other medical problems, and did not provide any foundation or objective medical basis supporting the conclusions they reached," warranting the entry of summary judgment.  *Id.*

Here, after a full trial of the issues, plaintiff has failed to establish that the complained of injuries were causally related to the accident.  Dr. Madhok's conclusory opinions concerning causation—which, as discussed, were woefully unsupported and undocumented—were ultimately "subjective in nature as they were dependent, at least in part, on plaintiff's complaints of pain," and therefore insufficient to establish causation.  *Toure v. Avis Rent A Car Sys., Inc.*, 98 N.Y.2d 345, 356 (2002).  Plaintiff bore a significant burden given that the record contains "strong evidence of degenerative changes as a likely cause of [plaintiff's] symptoms," requiring him to "come forward with evidence that the accident was a substantial factor in causing [his] injuries." *Chung*, 70 Misc. 3d at 791 (citing *Thompson v. Bronx Merchant Funding Servs., LLC*, 166 A.D.3d 542, 544 (1st Dept. 2018) (imposing summary judgment where plaintiff's experts "provided conclusory opinions that her claimed injuries in those parts were causally related to the accident, without adequately addressing the degenerative findings by defendants' radiologists

10

and the findings in plaintiff's own MRI reports, including disc desiccation [and] osteophytes")).

In sum, then, after trial of this case, plaintiff has failed to meet his burden to establish that any injuries complained of constituted serious injury causally related to the accident in this case. As such, judgment must be entered in favor of defendant.

**Referral to NYS OPMC Regarding Conduct of Dr. Madhok**

This Court cannot fully evaluate the conduct of a medical professional. However, the evidentiary record of this case—portions of which are detailed in this decision—raises sufficient concerns about the conduct of Dr. Ricky Madhok, a neurosurgeon, such that further inquiry may be warranted. Those concerns include the circumstances under which the subject spinal fusion surgery was performed, the necessity for such surgery, the failure to maintain adequate radiological and narrative records documenting the need for the subject surgery and the manner in which consent was obtained in connection therewith. Further, as detailed herein, the Court found aspects of Dr. Madhok's testimony wanting, which could bear on his moral fitness and professional competence.[8]

The New York State Health Department's Office of Professional Medical Conduct (NYS OPMC), together with the State Board for Professional Conduct, is charged with investigating complaints of negligence, incompetence, and lack of moral fitness lodged against licensed physicians. *See* New York State Department of Health, *Understanding New York's Medical*

---

[8] Other recent court decisions have questioned Dr. Madhok's professional activities. For example, a court found that a dislodged screw "was actually malpositioned by his surgeons," including Dr. Madhok, during a laminectomy, providing a defense to a hospital sued for displacement of that screw. *Sottosanti v. St. Francis Hosp.*, 2023 WL 4421177, at *1-4 (N.Y. Sup. Ct. June 6, 2023). In another matter, a trial court has twice rebuffed efforts by Madhok to obtain summary judgment in a case alleging negligent performance of a cervical fusion procedure, quoting an expert report opining that "the surgery performed by Dr. Madhok on the plaintiff was in a manner not consistent with accepted standards of medical practice." *McKinnon v. Madhok*, Index No. 600001/2014 (Sup Ct. Nassau County July 6, 2023).

*Conduct Program – Physician Discipline,* https://www.health.ny.gov/publications/1445/ (last visited Apr. 4, 2024) [https://perma.cc/QV2N-T6NF].  Via this Opinion, which will be transmitted to OPMC, this Court specifically requests that Dr. Madhok's conduct be investigated by OPMC, and that all further appropriate steps and procedures be implemented by that entity. OPMC and its investigations may request additional materials from the United States Attorney's Office, Civil Division, 610 Federal Plaza, Central Islip, NY 11722-4454, which is hereby directed to provide reasonable assistance as requested.

**Conclusion**

 Based on the foregoing, the Clerk is directed to:

1. Enter judgment in favor of defendant, closing the case, and

2. Provide a copy of this Order to NYS OPMC at the following address:

    New York State Department of Health
    Office of Professional Medical Conduct
    Riverview Center
    150 Broadway, Suite 355
    Albany, New York 12204
    opmc@health.ny.gov

    which shall investigate further as it deems appropriate.


**SO ORDERED.**

Dated: April 4, 2024
       Central Islip, New York

/s/ Gary R. Brown
GARY R. BROWN
United States District Judge